# STATE OF CONNECTICUT *v.* RUBEN FELICIANO
## (SC 16335)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued April 20—officially released June 19, 2001

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Elpedio N. Vitale*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant was charged with one count of murder in violation of General Statutes § 53a-54a[1] and one count of felony murder in violation of General Statutes § 53a-54c.[2] After a jury of twelve convicted the defendant of both offenses, the trial court merged the

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a *person in the defendant's situation under the circumstances as the defendant* believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

[2] General Statutes § 53a-54c provides: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant *was not the only participant in the underlying crime, it shall be an affirmative* defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

convictions and sentenced the defendant to a term of sixty years imprisonment, to be served consecutively to the life sentence he was serving for an unrelated federal conviction. He raises three issues on appeal, specifically, that the trial court improperly: (1) delivered three "Chip Smith"[3] charges to the jury depriving him of his federal constitutional rights to due process and an uncoerced jury verdict; (2) deprived him of his federal constitutional rights to a fair and impartial jury by failing to investigate adequately the allegation of jury misconduct and denying his motion for a mistrial; and (3) permitted the state to introduce evidence of the defendant's drug use to establish a motive for the murder. We reject these claims and affirm the judgment of the trial court.

The record reveals the following facts. In January 1997, the sixty-nine year old victim, Charles Westendorff, lived in the first floor apartment of a three-family home at 114 Liberty Street in Meriden. He had lived there for twenty-five years. His daughter and her family resided in the second floor apartment, and Jeffrey Lorenzo and his girlfriend, Nohemi Rivera, lived in the third floor apartment. During the fall of 1996, the defendant, who was Lorenzo's brother, resided with Lorenzo and Rivera, during which time he got to know the victim.

On or around Thanksgiving of 1996, the defendant moved in with his girlfriend, Cathleen Magrath, who lived with her sister on Olive Street in Meriden. Soon thereafter, Magrath noticed a change in the defendant's behavior: his whereabouts were often unknown; he

---

[3] "A Chip Smith instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity. See *State* v. *Smith*, 49 Conn. 376 (1881) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Pare*, 253 Conn. 611, 616 n.4, 755 A.2d 180 (2000). A similar jury instruction, known as an *Allen* charge, is utilized in the federal courts. *Allen* v. *United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896).

admittedly stole Magrath's leather jacket in order to obtain drugs; and he was observed using crack cocaine. Magrath noticed that several other items, including her stereo and her sister's wallet, mysteriously were missing from the apartment. Shortly after a New Year's Eve party at which the defendant became intoxicated, Magrath decided that she wanted to terminate their relationship. Thereafter, although the defendant no longer stayed at Magrath's apartment, he failed to remove his belongings, and often returned uninvited.

On January 25, 1997, the victim's body was discovered in his apartment by his daughter. His legs had been bound together at the ankles, and he had been stabbed five times in the neck and chest. Excessive bleeding and asphyxia caused the victim's death sometime between the evening hours of January 24, 1997, and the early morning hours of January 25, 1997. There were no signs of forcible entry. Several items were missing, including the victim's television set, his wallet, jewelry, foreign coins that had been given to him by his son, a pair of black imitation leather gloves and a hat with a brim and side flaps.

On either January 24 or 25, 1997, the defendant visited an acquaintance, Angel DeJesus, at his home in Meriden. The defendant was wearing a pair of black leather gloves and what DeJesus described as a "Russian winter hat" that he had never seen the defendant wear before. The defendant confessed to DeJesus that he had "murdered somebody in his brother's building." He told DeJesus that he had gone there to pick up some money that he was owed and got into an argument with the victim, whom he then tied up and killed. The defendant also showed DeJesus a box of foreign coins and asked him if he knew their value. A few days later, the defendant visited Magrath's apartment in the middle of the night and confessed to her that he had killed the victim. The defendant asked Magrath for money for a train ticket to New Jersey, but she refused to give him any

money. When contacted by the police, the defendant acknowledged that he knew the victim but denied any involvement in the murder. He provided the police with the name of an alibi witness who failed to corroborate his story. Additional facts will be provided where necessary.

## I

The defendant claims that his rights to due process and to a jury verdict free of coercion were violated when the trial court twice orally, and once in writing, gave the jury a Chip Smith instruction. Although the defendant acknowledges that trial courts routinely use the Chip Smith instruction when juries report that they are experiencing difficulty in reaching a unanimous verdict, he claims that under the particular circumstances of the present case the use of such an instruction was coercive. The state defends the trial court's decision, contending that the otherwise appropriate instruction did not create an atmosphere of coercion that could otherwise threaten a defendant's constitutional right to a fair trial. We agree with the state.

## A

The following facts are pertinent to a proper resolution of this claim. On Monday, April 10, 2000, the trial court charged the jury. Shortly after it commenced deliberations, the jury requested that the testimony of four witnesses be played back. That testimony was played for the jury on Tuesday, April 11, 2000, and lasted approximately four and one-half hours, not including the breaks "of fifteen minutes or so between each full playback of both cross and direct [examination] . . . ." Near the end of the day, the jury asked to rehear the court's charge on reasonable doubt, intent and "lack of evidence." The court repeated those instructions the following morning, April 12. Later that day, the jury requested and was given a written copy of the charge

on reasonable doubt and the state's burden of proof. The jury thereafter requested to hear additional testimony that took approximately thirty to forty minutes to play back.

That same day, the jury reported that it was unable to come to a unanimous decision on the first count, the charge of murder. With the agreement of both the state and the defendant, the court stated the following: "Okay, folks, I have your note. It simply reads: 'We are unable to come to a unanimous decision on the first count.' In response to that, let me tell you that when you subtract the read backs and time spent in court or in breaks, you have been deliberating for less than a full day. At this point I simply suggest that you continue your deliberations. You should review the evidence and the position of each juror to determine if any evidence has been overlooked or any juror's position misunderstood with respect to either the evidence or the law."

On Thursday, April 13, 2000, at approximately 2 p.m., the jury reported that it could not come to a unanimous decision on either the first or the second count. In response, the trial court provided the following instruction: "I have some additional instruction for all of you, so please listen up: The court is of the opinion that it should give you additional instructions regarding this matter to see whether or not it is within your reach to arrive at a verdict in this matter. So with this thought in mind, the court wishes to state to you at the outset that these additional instructions are not to be construed by you as to be coercive in any manner or to compel you to arrive at a verdict or to compel any of you to change your position. These instructions are designed to aid you in considering your own positions individually and in weighing your individual positions against the collective position—positions or the positions of other members of the jury and after having done so, to reconsider whatever conclusions that you

individually may have reached. They're not meant to suggest to you in any manner that you are compelled to reach a verdict or that you must reach a verdict. The court's instructions as I so give you now are only to provide you with additional information so that you may return to your deliberations and see whether or not you can arrive at a verdict.

"Although the verdict to which each juror agrees must of course be his or her conclusion and not a mere acquiescence in the conclusion of others, in order to bring minds to a unanimous result you should, in conferring together, pay proper respect to each other's opinions and listen with candor to each other's arguments. If much [of] the larger number of the panel are for a particular verdict, a dissenting juror should consider why his or her own conclusion is one that makes no impression upon the minds of the others who are equally honest and intelligent, who have heard the same evidence, what the equalizers are to arrive at the truth, and are under the sanction of the same oath. The minority are seriously to ask themselves whether they may not reasonably doubt the conclusion of a judgment that is not concurred in by most of those with whom they are associated and distrust the weight or sufficiency of that evidence that fails to carry in the minds of their fellow jurors. I'm going to ask that you go back to the jury room to discuss this case further. You may retire, thank you." Neither party objected, and the jury resumed its deliberations.

Later that day, the jury sent out a note asking two questions. Specifically, the jury wanted to know whether it could reach a unanimous decision on the second count, the charge of felony murder, but not on the first count; and whether, with regard to the second count, there must have been an intent to rob before the actual murder took place. The court answered "yes" to the first question, and in connection with the second

inquiry, the court responded that "death must occur in the course of a robbery and in furtherance of such robbery or of flight therefrom."

The morning of the next day, April 14, 2000, was spent investigating the claim of alleged jury misconduct that we discuss in part II of this opinion. After the jury resumed its deliberations, it requested a written copy of the Chip Smith charge. Again, both parties agreed and a copy was furnished. Later that day, the jury again advised the court that it was unable to reach a unanimous verdict on either count, this time indicating that the vote was eleven to one. The defendant objected to the giving of any additional Chip Smith charge and suggested instead that the court declare a mistrial. The state objected to a mistrial, arguing that the jury had, in actuality, spent only four hours deliberating since the first Chip Smith charge had been provided. The state further contended that "repetition of an otherwise appropriate charge does not create an atmosphere of coercion that may threaten [the defendant's] constitutional right to a fair trial." The trial court agreed with the state, concluding that the jury had not spent sufficient time deliberating.[4] Accordingly, the court denied

---

[4] The court provided the following explanation: "The motion for a mistrial is denied. I agree with the accounting of the time that [the trial prosecutor] has just put on the record. Deliberations began late Monday afternoon, probably around 4 o'clock. There really wasn't much time to deliberate on Monday. I think on Tuesday, there were extensive read backs on Tuesday. Wednesday there was some time to deliberate, as yesterday, but there were other read backs yesterday. . . . There have been late starts upon the request of the jurors, or simply because of the usual delays in getting started. There have been early dismissals on at least one occasion. I don't think the jury has deliberated for probably much more than two days in this case.

"Of significance to the court, is the fact that the court has no idea how long that eleven to one, and that could be either way, no matter how long that impasse has existed, it may well be that there has been a much larger or more equal distribution of people on both sides of the issue. I can't say . . . based on what I have, that this is—that this eleven to one is something that could be anything more than something that has arisen within the past few minutes, for example. There is no indication as to how long it's been eleven to one or how long it was to some other number. I just can't read

the defendant's motion for a mistrial, and provided its third and final Chip Smith charge.

The court stated: "I have your note. I would ask that you continue your deliberations to see whether or not, in fact, all deliberations have been exhausted. I have given you my charge on, as you put it, majority, minority to make sure that I have properly explained the law to you. I am going to read that to you again. Keep in mind that under no circumstance am I compelling any of you to reach your verdict in this case, but I'm going to read it to you again and it is as follows: The court is of the opinion that it should give you additional instructions regarding this matter to see whether or not it is within your reach to arrive at a verdict in this matter. So, with that thought in mind, the court wishes to state to you at the outset that these additional instructions are not to be construed by you as to be coercive in any manner or to compel you to arrive at a verdict or to compel any of you to change your position. These instructions are designed to aid you in considering your own positions individually . . . [and weighing] your individual positions against the collective positions or the position

that into the deliberations. So, I think under all of those circumstances, the fact that there is so far, in my opinion, has not been sufficient time. Certainly, since I Chip Smith'd them yesterday, as [the trial prosecutor] has indicated, there simply has not been a significant amount of time that's passed. The fact that they have my written Chip Smith charge does not really undercut the fact that it might not have that much import to them. I don't even know if everybody's reading it or has read it, and I'm going to give them one final Chip Smith charge repeating what I've already told them. We will see where that goes. It is certainly not coercive. The language in the preface to that charge which is taken from *State* v. *O'Neill*, [200 Conn. 268, 511 A.2d 321 (1986)], clearly drives home to the jurors, before I mention a word about anything else, that they are still obligated to vote their own conscience and that the instructions are not coercive in any manner. I cannot see how I can make it any clearer to them. Therefore, I will give them a rereading of my Chip Smith charge. And there is nothing in the case law that I have ever seen or am aware of in our state that in any way limits the number of times the charge can be given. I don't think that exists in any case law that I've seen from our Supreme or Appellate Courts."

of other members of the jury, and after having done so, to reconsider whatever conclusions that you individually may have reached. They are not meant to suggest to you in any manner that you are compelled to reach a verdict or must reach a verdict. And I can't make that clear enough to you.

"The court's instructions that I shall give you now are only to provide you with additional information so that you may return to your deliberations to see whether or not you can arrive at a verdict. Although the verdict to which each juror agrees must of course be his or her conclusion and not a mere acquiescence in the conclusion of others. In order to bring minds to a unanimous result, you should, in conferring together, pay proper respect to each other's opinion and listen with candor to each other's arguments. If much [of] the large number of the panel are for a particular verdict, a dissenting juror should consider why his or her own conclusion is one that makes no impression upon the minds of others, who are equally honest and intelligent, who have heard the same evidence with the equal desire to arrive at the truth and are under the sanction of the same oath. The minority ought seriously to ask themselves whether they may not reasonably doubt the conclusion of a judgment that is not concurred in by most of those with whom they are associated and distrust the weight or sufficiency of that evidence that fails to carry in the minds of the fellow jurors. I'm going to ask that you go back to the jury room and discuss the case further."

A short time later, the jury returned with a verdict, finding the defendant guilty of both charges. Pursuant to a request by the defendant, each juror was polled individually, and each responded "guilty" when asked whether the defendant was guilty or not guilty of the crimes of murder and felony murder.

## B

It is well settled that a Chip Smith charge is an acceptable method of assisting the jury to achieve unanimity. *State* v. *Smith*, 49 Conn. 376, 386 (1881); see *State* v. *Wooten*, 227 Conn. 677, 707, 631 A.2d 271 (1993); *State* v. *Smith*, 222 Conn. 1, 21–23, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); *State* v. *Pinnock*, 220 Conn. 765, 793–95, 601 A.2d 521 (1992); *State* v. *Ryerson*, 201 Conn. 333, 349–50, 514 A.2d 337 (1986); *State* v. *O'Neill*, 200 Conn. 268, 283, 511 A.2d 321 (1986); *State* v. *Avcollie*, 188 Conn. 626, 641, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *State* v. *Stankowski*, 184 Conn. 121, 147, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). The purpose of the instruction is "to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence . . . ." D. Borden & L. Orland, 5 Connecticut Practice Series: Connecticut Criminal Jury Instructions (2d Ed. 1997) § 4.4, p. 245. "Better than any other statement . . . it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . ." (Internal quotation marks omitted.) *State* v. *Ralls*, 167 Conn. 408, 424–25, 356 A.2d 147 (1974), overruled on other grounds, *State* v. *Rutan*, 194 Conn. 438, 479 A.2d 1209 (1984).

Indeed, the Chip Smith charge has been upheld so consistently by this court that the defendant does not challenge it directly. Rather, the defendant claims that, because the court knew that the jury had become deadlocked eleven to one for conviction and the court was aware that the deliberations had become heated, the Chip Smith charge was unfairly coercive in violation of his due process rights. We are unpersuaded.

The defendant overlooks the fact that "a Chip Smith charge, while encouraging a continued search for unanimity, also stresses that each juror's vote must be his [or her] own conclusion and not a mere acquiescence in the conclusions of his [or her] fellows . . . ." (Internal quotation marks omitted.) *State* v. *Wooten*, supra, 227 Conn. 707. The language of the charge does not direct a verdict, but encourages it. As the Appellate Court recently noted, "a trial court's repetition of a Chip Smith charge does not threaten a defendant's constitutional right to an uncoerced jury . . . ." *State* v. *Stevenson*, 39 Conn. App. 810, 813, 667 A.2d 1296 (1995). "Repetition of an otherwise appropriate charge does not create an atmosphere of coercion that may threaten a defendant's constitutional right to a fair trial." (Internal quotation marks omitted.) Id.; see *State* v. *Martinez*, 173 Conn. 541, 543–44, 378 A.2d 517 (1977) (not improper for trial court on two occasions to encourage jurors to continue deliberations after they disclosed they were deadlocked); *State* v. *Ralls*, supra, 167 Conn. 423 (not improper for trial court to give portions of Chip Smith charge, once before and once after jury indicated deadlock); see also *United States* v. *Ailsworth*, 138 F.3d 843, 852 (10th Cir.), cert. denied, 525 U.S. 896, 119 S. Ct. 221, 142 L. Ed. 2d 181 (1998) (no coercion demonstrated when trial court gave jury two *Allen*[5] charges in addition to written copy of instruction); *United States* v. *Barone*, 114 F.3d 1284, 1304–1305 (1st Cir.), cert. denied, 522 U.S. 1021, 118 S. Ct. 614, 139 L. Ed. 2d 500 (1997) (trial court did not err in giving jury two *Allen* charges); *United States* v. *Seeright*, 978 F.2d 842, 850 (4th Cir. 1992) (trial court's exercise of discretion in giving jury two *Allen* charges was proper); *United States* v. *Ruggiero*, 928 F.2d 1289, 1299 (2d Cir.), cert. denied sub nom. *Gotti* v. *United States*, 502 U.S. 938, 112 S. Ct.

---

[5] *Allen* v. *United States*, 164 U.S. 492, 501, 17 S. Ct. 154, 41 L. Ed. 528 (1896); see footnote 3 of this opinion.

372, 116 L. Ed. 2d 324 (1991) (not inevitably coercive to give two *Allen* charges); *United States* v. *Reed*, 686 F.2d 651, 653 (8th Cir. 1982) (giving two *Allen* charges to jury not per se coercive); *Jones* v. *State*, 270 Ga. 25, 28, 505 S.E.2d 749 (1998) (same); *People* v. *Brooks*, 152 App. Div. 2d 591, 591–92, 543 N.Y.S.2d 704 (1989) (no error in giving two *Allen* charges as such charges did not coerce verdict); but see *United States* v. *Seawell*, 550 F.2d 1159, 1163 (9th Cir. 1977), cert. denied, 439 U.S. 991, 99 S. Ct. 591, 58 L. Ed. 2d 666 (1978) (per se error to give two *Allen* charges).

It is the language used and not the number of times a Chip Smith charge is given that determines whether the instruction is improper. If the words are not coercive, then the fact that they are uttered more than once does not change their character. In the present case, the language was essentially the standard language approved time and time again. The first part of the instructions contained the admonition that the trial court was not compelling the jury to reach a verdict ("under no circumstance [is the court] compelling you . . . these additional instructions are not to be construed . . . to be coercive . . . or to compel you to arrive at a verdict or to compel any of you to change your position"). The second half of the instructions merely explicated the deliberative process to the jury ("[P]ay proper respect to each other's opinions and listen with candor to each other's arguments. . . . [A] dissenting juror should consider why his or her own conclusion . . . makes no impression upon the minds of the others . . . . [T]he minority ought seriously to ask themselves whether they may not reasonably doubt the conclusion of a judgment that is not concurred in by most of those with whom they are associated . . . .").

By asking the jurors to consider the views and arguments of others, the court's instructions embodied the very essence of the jury system, which is "to secure

unanimity by a comparison of views, and by arguments among the jurors themselves." (Internal quotation marks omitted.) *Lowenfield* v. *Phelps*, 484 U.S. 231, 237, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). It would defy logic to suggest that a juror should not listen with deference to the views of others, particularly when a majority of the others holds a different view of the case than his own. No juror should possess the blind determination that the verdict shall represent his opinion, deaf to those whose equal intelligence and integrity have brought them to a different place. See id. The charge in the present case, when read as a whole, properly informed the jury that each member had the individual responsibility to consider the opinion of the others *and to satisfy him or herself* of the correctness of his or her opinion and not merely to acquiesce in the conclusion of others.

The defendant argues that this case is different from the other cases in which a Chip Smith instruction was given, contending that in this case, the trial court was aware that the jury was deadlocked eleven to one for conviction, and, furthermore, that the jury knew that the court was cognizant of the split when it gave the jury the Chip Smith charge. The state disputes this portrayal of the record, and like the state, we do not read the record to support the defendant's assertion. On the contrary, when the trial court gave the second Chip Smith charge, it did not know whether the majority was in favor of conviction, as evidenced by the following: "Of significance to the court, is the fact that the court has no idea how long that eleven to one, and that could be either way, no matter how long that impasse has existed, it may well be that there has been a much larger or more equal distribution of people on both sides of the issue. I can't say . . . based on what I have, that this is—that this eleven to one is something that could be anything more than something that has

arisen within the past few minutes, for example. There is no indication as to how long it's been eleven to one or how long it was to some other number. I just can't read that into the deliberations."[6]

The defendant also relies on the fact that the jury reached its verdict fifteen minutes after being given the third Chip Smith instruction as evidence that the jury felt coerced. "The length of time it takes a jury to reach a verdict after an *Allen* charge has been delivered is not a factor logically to be considered in determining whether the charge should have been given in the first place." *United States* v. *Melendez*, 60 F.3d 41, 51 (2d Cir. 1995). Because we sanction the fundamental logic underlying the Chip Smith charge, we legitimately cannot reject it because of the speed with which it served its function. *United States* v. *Hynes*, 424 F.2d 754, 758 (2d Cir.), cert. denied, 399 U.S. 933, 90 S. Ct. 2270, 26 L. Ed. 2d 804 (1970), vacated on other grounds, *Colon* v. *United States*, 516 U.S. 1105, 116 S. Ct. 900, 133 L. Ed. 2d 834 (1996); see, e.g., *United States* v. *Winters*, 105 F.3d 200, 203 (5th Cir. 1997) (verdict thirty minutes after *Allen* charge not coercive).

---

[6] Even had the trial court been aware of the split, this court previously has expressed its agreement with the Second Circuit Court of Appeals that: "The fact that the judge knew that there was a lone dissenter does not make the charge coercive inasmuch as the nature of the deadlock was disclosed to the Court voluntarily and without solicitation. See *Bowen* v. *United States*, 153 F.2d 747 [(8th Cir.), cert. denied, 328 U.S. 835, 66 S. Ct. 980, 90 L. Ed. 1611 (1946)]. To hold otherwise would unnecessarily prohibit the use of the *Allen* charge in circumstances where the judge was made aware of the numerical division of the jurors, for example, by an over-zealous juror, although he had not made the forbidden inquiry himself. *United States* v. *Meyers*, 410 F.2d 693, 697 (2d Cir.), cert. denied, 396 U.S. 835, 90 S. Ct. 93, 24 L. Ed. 2d 86 (1969); see also *United States* v. *Robinson*, 560 F.2d 507, 517–18 (2d Cir. 1977) [cert. denied, 435 U.S. 905, 98 S. Ct. 1451, 55 L. Ed. 2d 496 (1978)], upholding the use of the *Allen* charge although the judge knew of an eleven to one deadlock and knew the identity of the dissenter." (Internal quotation marks omitted.) *State* v. *Avcollie, supra,* 188 Conn. 641–42.

Finally, the defendant contends that because the Chip Smith charge was followed by periods of screaming and profanity emanating from the jury room, it was necessarily coercive. The alleged demeanor of the jury during its deliberations is not an appropriate basis upon which to assess the coercive effect of a jury instruction.[7] More relevant is the manner in which the jurors individually announced their unanimous verdict.

## II

The defendant next contends that the trial court improperly denied his motion for a mistrial based upon his claim of jury misconduct. He further maintains that the court improperly failed to investigate adequately the allegation. The following additional facts are relevant to this claim.

## A

On the morning of April 14, 2000, the state's attorney related that, on the previous day, he had been approached by a correction officer who told him that "the deliberations in this case [were] becoming quite loud." The correction officer indicated that he believed that he had heard a statement "that could be construed as a comment regarding the defendant's failure to testify in this particular case." Before reporting this on the record, the state had brought this matter to the attention of both the defendant and the court, and it was decided that the court would "bring out jurors individually and question them with regard to what was or was not said in connection with yesterday's deliberations." The court indicated that the parties had indeed reached an agreement on how best to proceed and outlined the strategy. "So the protocol is that I will call them each out. I have a line of questions agreed upon by the attor-

---

[7] We note that the trial court made no factual findings in connection with this alleged behavior; nor was it called upon to make any findings.

neys and we will ask each juror those questions and see where that takes us." Thereafter, each juror individually was called into the courtroom and asked whether he or she "personally recall[ed] any comment by any juror concerning the defendant's failure to testify here in court."[8]

[8] In response to the trial court's inquiry, the first juror testified: "There was a discussion about what we could consider as evidence and what we could not consider as evidence. The discussion came up that—it was pointed out that the defendant did not make a statement, at which time we discussed the fact that to the best of our understanding that this was not to be considered as meaningful in our discussion." The juror further informed the court that there was nothing about this conversation that would impact his/her ability to resume deliberations and he/she could assure the court that he/she could reach a "decision in this case without at all considering as a factor the defendant's failure to testify here in court."

The second juror testified: "Honestly, yeah, somebody did bring that up, but we corrected the person saying that we can't take that against—we can't hold that against a defendant." The juror also stated to the court that he/she understood that he/she could not draw any adverse inference against a defendant for his failure to testify, and that the decision could not, in any way, be a factor in his/her decision.

The third juror testified: "Not to my recollection, no."

The fourth juror testified: "No. I mean, I never heard anything about, you know, him not testifying, being any kind of a . . . you know, evidence that was weighed in any way." Furthermore, when this juror was asked if he/she understood that the law required that he/she not consider the defendant's failure to testify as a factor in any way in his/her decision, he/she responded: "Right, because he's got a right to remain silent . . . ." This juror also assured the court that he/she would continue to follow this rule when deliberations resumed.

The fifth juror testified that he/she heard somebody say that the defendant's failure to testify in court could not be used as evidence against the defendant. When the juror was asked if he/she heard any other discussion in this regard, he/she responded, "[n]ot that I can recall. That was the only thing that I heard." This juror further stated that he/she was aware that he/she could not draw any adverse inference from the defendant's failure to testify and that the failure to testify could not be used against the defendant in any way in the deliberations. Finally, the juror assured the court that he/she could follow this instruction during the balance of the deliberations.

The sixth juror testified: "To be honest, no, I do not." This juror further stated that he/she understood that he/she could not draw any adverse inference, or use in any way, the defendant's failure to testify, and he/she said he/she would continue to abide by this rule when deliberations resumed.

The seventh juror testified that there was a discussion in which someone

At the conclusion of the hearing, the defendant moved for a mistrial based upon the comment regarding

said that the defendant's failure to testify could be used against the defendant. This juror also stated, however, that he/she was aware of the rule that the defendant's failure to testify could not be used in any way against him, and the juror assured the court that he/she would continue to follow this rule.

The eighth juror testified: "I don't recall that specific comment, but what I do—I do remember some emphasis being placed on that the defendant does not have to testify and that the premise must be that he's presumed innocent." This juror remarked that he/she heard no discussion that the defendant's failure to testify was something that could be used against the defendant. Finally, he/she stated that he/she understood that a defendant's failure to testify could not be used against him in any way, and he/she assured the court that he/she would continue to follow this law without any reluctance during further deliberations.

The ninth juror testified: "I think may—we were or some people were battling around with the idea of whether that should be considered or not, and that's all I really remember about that." The juror reiterated that he/she could not remember anything else about the discussion. The juror told the court that he/she personally understood that the defendant's failure to testify could not enter into the deliberations in any way, and he/she assured the court that he/she had followed this rule thus far and would continue to do so.

The tenth juror testified: "I think it may have come up in some conversation at some point which was then—I can't remember who made the comment, but I think it was explained that that—that it wasn't necessary that he testify, that he didn't have to, that he—that, you know, that we couldn't look at that either way." The juror further told the court that he/she understood that a defendant has a constitutional right not to testify and that the exercise of that right could not be considered as a factor in any way during deliberations. The juror assured the court that he/she would continue to follow the rule prohibiting the drawing of any adverse inference against the defendant for his failure to testify.

The eleventh juror testified: "I remember it coming up as a comment of—we were talking about lack of evidence. And what I remember is that the comment was that there's a lack of evidence on a—a certain amount of lack of evidence on the prosecution's side and that there also was a lack of evidence on the defense side. I believe that was the context that I heard it in." This juror told the court that he/she understood that the defendant had no burden of proof, that the defendant did not have to prove anything, that he/she had followed this rule thus far and would continue to follow this rule. This juror further told the court that he/she understood that the defendant's failure to testify could not be used against the defendant, that he/she could draw no adverse inference at all from the defendant's failure to testify and that the defendant's failure to testify could not be considered during the deliberations.

his failure to testify. Additionally, he requested that the court conduct a further inquiry into the subject in order to ascertain which juror had made the offending remark. The court denied both requests, finding that "it is very clear, compellingly clear to the court from the credible evidence from those jurors, that it was ultimately understood by all the jurors that the defendant's failure to testify was not a factor to be used against him in any way and could not be considered by [them]." The court thereafter summoned the jury and provided additional instructions on the presumption of innocence and the defendant's constitutional right not to testify. Additionally, the court received individual assurances from all of the jurors that they would draw no unfavorable inference from the defendant's failure to testify and that that fact would not enter their deliberations in any way.

The defendant claims on appeal that the trial court improperly failed to grant his motion for a mistrial. He further argues that the court should have conducted an additional inquiry to learn the identity of the juror who had made the comment regarding the defendant's failure to testify and held an additional hearing with that juror. We are unpersuaded.

## B

The law relating to alleged juror misconduct is well settled. "Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to a jury trial guarantees to the criminally accused a

The twelfth and final juror testified that the subject was brought up but it was determined that it could not be an issue in the case. The juror stated that he/she and the remaining jurors understood the court's instruction that the defendant has a right not to testify and that his exercise of that right could not be used against him in any way. Finally, he/she assured the court that he/she would continue to follow this rule during further deliberations.

fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . .

"To ensure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment . . . a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality. . . . We previously have instructed that the trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jury misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations of jury misconduct; and (3) the state's interests of, inter alia, jury impartiality, protecting jurors' privacy and maintaining public confidence in the jury system. . . .

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jury [bias or] misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them. . . . Consequently, the trial court has wide latitude in fashioning the proper response to allegations of juror bias. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury mis-

conduct can fairly be characterized as an abuse of its discretion. . . . Although we recognize that trial [c]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . Ultimately, however, [t]o succeed on a claim of [juror] bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact." (Citations omitted; internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 295–97, 750 A.2d 1059 (2000). Finally, when, as in this case, the trial court is in no way responsible for the alleged juror misconduct, the defendant bears the burden of proving that the misconduct actually occurred and resulted in actual prejudice. *State* v. *Booth*, 250 Conn. 611, 649, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

In the present case, both the defendant and the state agreed with the form and the scope of the court's inquiry into the allegation of juror misconduct. That inquiry revealed that one juror had commented upon the defendant's failure to testify. That comment did not inject any new material into the deliberations as all the jurors were aware that the defendant had chosen not to testify. Moreover, there is not even a hint that the commenting juror had been inclined to use that fact in deciding the issues before the jury. The other jurors who had heard the remark promptly reminded the commenting juror that that was an improper factor to consider in the determination of the issue of the defendant's guilt.[9]

Fortunately, this issue arose before the jury had reached a verdict. Consequently, the trial court was

---

[9] Notably, not all the jurors recalled the remark, suggesting that whatever comment had been made did not result in a discussion of any length or significance.

permitted to call each juror individually to receive face-to-face assurances that the defendant's failure to testify would play no role in the deliberations. The court established to its satisfaction that each juror understood that no adverse inference could be drawn from the defendant's decision not to testify and that his decision could not be a factor in any way in the deliberative process. Finally, the court received assurances from each juror that he or she would abide by these rules when deliberations resumed. As noted previously herein, in rejecting the defendant's request for a mistrial, the court observed: "[I]t is very clear, compellingly clear to the court from the credible evidence from those jurors, that it was ultimately understood by all the jurors that the defendant's failure to testify was not a factor to be used against him in any way and could not be considered by [the jurors]. Each juror acknowledged that right, that it was understood, and that they could continue to give it unswerving allegiance."

The standard used to assess prejudice is whether "the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror." (Internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 628, 682 A.2d 972 (1996). Because it is in the best position to evaluate the assurances by the jurors, the trial court's credibility assessment "is entitled to substantial weight." (Internal quotation marks omitted.) Id., 631. The defendant has failed to demonstrate that the hearing conducted by the trial court was inadequate to safeguard his right to a trial before an impartial jury. Furthermore, in light of the findings by the trial court in this case, the defendant cannot meet his burden of proof that actual prejudice resulted from the juror's remark.

## III

The defendant's final claim relates to the state's evidence of his own prior misconduct. Specifically, the defendant contends that the trial court abused its discretion when it allowed Magrath, the defendant's girlfriend, to testify that he had stolen from her because this evidence was remote and irrelevant. According to the state, this evidence was relevant on the issue of motive. We agree with the state.

Outside the jury's presence, Magrath testified to the defendant's change in demeanor, his use of crack cocaine, his theft of her leather jacket, which he admitted to her had been pawned for drug money, and the mysterious disappearance of both her stereo and her sister's wallet. The state offered this evidence, claiming that it was relevant to prove that the defendant had had a motive when he committed the robbery that resulted in the victim's death, namely, to get money to buy drugs. Over the defendant's objection, the trial court determined that the probative value of the evidence outweighed its prejudicial impact. Specifically, the court concluded that remoteness went to the weight of the evidence and not its admissibility, that the evidence was relevant to prove that the defendant's motive for committing the robbery or burglary was to obtain money in order to purchase drugs, and finally, that the evidence was not so egregious as to inflame the jury.[10] In its final instructions to the jury, the trial court provided an instruction limiting the jury's use of the evidence.[11]

---

[10] In regard to the issue of remoteness, the trial court noted that "[e]vents at the end of January [when the homicide occurred] are only a matter of weeks from the time the defendant was asked to leave the apartment [and] are not so remote in time as to make this evidence inadmissible. There's nothing in the evidence before the court to suggest that the defendant's condition immediately abated when he was asked to leave the premises."

[11] The court's limiting instruction provided: "I have allowed evidence of the relationship between [Magrath] and the defendant in the events therein, solely for the limited purpose of showing what the state claims was the

The law relating to misconduct evidence is well settled. "As a general proposition, evidence of guilt of other crimes, because of its prejudicial nature, is inadmissible to prove that a defendant is guilty of the crimes with which he is charged. . . . Such evidence is admissible for other purposes, however, such as when it is particularly probative in showing such things as intent, an element in the crime, identity, malice, motive or a system of criminal activity, to name some exceptions to the rule. . . . The trial judge, however, must determine in the exercise of judicial discretion that its probative value outweighs its prejudicial tendency. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Baldwin*, 224 Conn. 347, 354–55, 618 A.2d 513 (1993).

In the present case, the state offered evidence from which it could be inferred that approximately one

motive of the defendant for committing the crimes charged. Any [such] conduct which may be reflected in such evidence of drug use or theft is to be disregarded by you. The defendant is not on trial for such misconduct. This evidence is merely offered to support the state's claim that the defendant had a motive to commit the crimes charged, and otherwise it has no bearing on your determination of charges against the defendant. You cannot use it for any other purpose. You can accept it or reject it just like any other evidence in the case. My allowing it gives it no special weight. You cannot infer from such evidence that the defendant is a bad character or has a criminal disposition. You may consider such evidence if you believe it and further find it logically, rationally and conclusively supports that the defendant in particular had a motive to commit the crimes charged. On the other hand, if you do not believe such evidence or even if you do [if] you should find that it does not logically, rationally and conclusively support that [the defendant] had the motive to commit the crimes charged, then you may not consider that testimony for any purpose at all."

The trial court also gave a lengthy, detailed instruction on motive. This instruction included the following: "In this case, on the issue of motive, the state offered evidence of the defendant's use of drugs and his desire to obtain money or property to exchange for drugs. You will recall the limiting instructions that I have given you on motive evidence."

month before the homicide, the defendant was stealing from Magrath to support a drug habit. According to the state, this drug habit was the motive for the defendant's commission of the robbery that resulted in the victim's death. The defendant argues that, in the absence of evidence demonstrating his financial status, the jury reasonably could not have inferred that his motive for committing the robbery was to obtain money to support his drug habit. We disagree. Because motive generally is proven by circumstantial evidence; *State* v. *Copas*, 252 Conn. 318, 338, 746 A.2d 761 (2000); the circumstances from which it may be inferred are relevant. *State* v. *Ruffin*, 48 Conn. App. 504, 710 A.2d 1381, cert. denied, 245 Conn. 910, 718 A.2d 18 (1998). The misconduct evidence directly pertained to the defendant's limited resources with which to purchase drugs. Therefore, it would have been logical for the jury to infer that the defendant's motive for committing the crime at issue was to obtain funds with which to buy drugs. "[A]n inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference." *State* v. *Copas*, supra, 340. Because Magrath's testimony reasonably was susceptible of supporting an inference regarding the defendant's motive for committing the alleged offenses, the trial court acted reasonably in concluding that the evidence was relevant.

Once evidence of the defendant's prior misconduct has been found relevant, its prejudicial impact must be evaluated. In admitting such evidence, the trial court's discretion is limited. *State* v. *Sierra*, 213 Conn. 422, 435, 568 A.2d 448 (1990). "The trial court's discretion to admit other crimes evidence imports something more than leeway in decision-making. . . . Discretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial

justice. . . . When assessing the admissibility of other crimes evidence, the application of a mechanical test determining that the proffered evidence fits within some class of exception to the rule of nonadmissibility, may obscure sight of the underlying policy of protecting the accused against unfair prejudice. That policy ought not to evaporate through the interstices of the classification. The problem is thus one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence." (Citations omitted; internal quotation marks omitted.) Id.

The record in the present case reflects that the trial court carefully balanced the probative value of the evidence against the prejudicial effect and determined that the prejudice did not outweigh its probative value. Evidence is prejudicial "when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Evidence concerning the defendant's use of drugs and his thefts from Magrath was introduced only on the issue of motive. The misconduct did not involve acts of violence that could have shocked or otherwise influenced the jury. Furthermore, the instructions limiting the use of the misconduct evidence served to minimize any prejudicial effect that it otherwise may have had. See *State* v. *Cooper*, 227 Conn. 417, 428, 630 A.2d 1043 (1993); *State* v. *Brown*, 199 Conn. 47, 58, 505 A.2d 1225 (1986).

Accordingly, we conclude that the trial court did not abuse its discretion in determining that the probative value of the testimony outweighed any prejudicial effect it might have had on the jury.

The judgment is affirmed.

In this opinion the other justices concurred.