STATE OF CONNECTICUT *v.* SAMUEL DAVIS
(AC 21965)

Foti, Flynn and Daly, Js.

Argued February 15—officially released May 14, 2002

*Alice Osedach-Powers*, assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Dennis O'Connor*, senior assistant state's attorney, for the appellee (state).

FLYNN, J. The defendant, Samuel Davis, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (2) and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35. On appeal, the defendant claims that the court improperly (1) denied his motion to suppress oral and written statements made to the police, (2) denied his motion to suppress the identification testimony of two witnesses, (3) failed to submit to the jury the findings required to enhance his sentences pursuant to General Statutes § 53-202k and imposed three separate enhancements under the statute, (4) violated his due process rights when it instructed the jurors to consider each other's feelings while deliberating and (5) gave a "Chip Smith" instruction. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early morning hours of August 17, 1997, the defendant was a passenger in a vehicle in Hartford with two other individuals. The three men decided to rob a drug dealer and the defendant drove one of the occupants to his car so that he could retrieve his gun. The three men drove around Hartford but could not find a drug dealer to rob. At one point in their travels, the men unsuccessfully attempted to rob a man at a pay telephone near Prospect Avenue. Eventually, the defendant and one of the other men exited the car and came upon the victim, James Boland, who had just been dropped off in front of his house. Boland, a member of the neighborhood block watch program, was armed and proficient in the use of firearms. As the defendant and

one of the other men approached Boland, a gunfight ensued in which Boland returned fire. Boland and the defendant both suffered gunshot wounds.

A neighbor, Lillian Ferdinand, heard the gunshots from her second floor apartment. She saw a motorcycle with two men on it stop in the vicinity of Boland's house. She heard someone say "get lost" or "get the 'f' out of here," and the men on the motorcycle rode away. From a different vantage point, she saw Boland crouched and leaning against a fence. He was holding his chest and said to her, "Lily, I've been shot . . . call the police." She called the police, went downstairs and saw Boland lose consciousness and fall to the ground.

Another neighbor, Nicholas Couloute, heard the gunshots from his third floor window. He saw the defendant lying in the driveway apron next to Boland's home. Couloute went outside and approached the defendant. As Couloute approached, the defendant propped up on his elbow, pointed a gun at him and said "get the f— out of here." Couloute retreated to his house and saw a motorcycle with two men on it approach the defendant. The defendant pointed a gun at the driver and said "get the f— out of here." Couloute returned to his house and both he and his wife saw that the defendant was wounded in the leg. Both Couloutes watched as a red, four door Buick pulled up to the defendant. Two individuals helped the defendant into the backseat and drove away.

Hartford police arrived at the scene and Boland was pronounced dead at 1:32 a.m. from a gunshot wound to the chest. Hartford police informed other local police departments that a suspect in a homicide had sustained a gunshot injury and had left the scene in a red vehicle. At about 4 a.m. Middletown police informed Hartford police that an individual had arrived at Middlesex Hospital with gunshot wounds to his leg and arm. The defen-

dant was subsequently transported to Hartford Hospital by the Life Star helicopter.

Nicolas Couloute and Thomas Staunton, the passenger on the motorcycle, were taken to Hartford Hospital to identify the defendant. Both Couloute and Staunton positively identified the defendant as the man they saw lying in the driveway area. Couloute also identified the red Buick, owned by the defendant's brother, as the vehicle that drove the defendant from the scene of the shooting. Based on the hospital identification, an arrest warrant was issued for the defendant.

The defendant was admitted to Hartford Hospital after undergoing surgery for bullet wounds to his left leg and arm. Two uniformed Hartford police officers guarded the defendant's hospital room and he was restrained to his bed by a leg shackle. After his surgery, the defendant requested to speak with the officers who had applied for the warrant for his arrest. Two detectives interviewed the defendant and he gave an oral statement inculpating himself in the victim's death. The defendant was discharged from the hospital and transported to the Hartford police station and placed under arrest. While at the police station, the defendant also gave a written statement inculpating himself.

At trial, Benjamin Brown, one of the occupants of the vehicle on the day of the murder, testified for the state. He confirmed that the defendant and the other individual left the vehicle and confronted the victim, and that the defendant was wounded in the confrontation. Brown further testified that when he helped rescue the defendant from the victim's driveway, the defendant stated that he thought he shot the victim.

Following a jury trial, the defendant was found guilty of felony murder, attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree and carrying a pistol or revolver without a per-

mit. The defendant was sentenced to a total effective term of 100 years in the custody of the commissioner of correction.[1] Pursuant to § 53-202k, the court also sentenced the defendant to five additional years imprisonment, consecutive on each of the charges of felony murder, attempt to commit robbery in the first degree and conspiracy to commit robbery in the first degree for a total enhancement of fifteen years. This appeal followed.

I

The defendant first claims that the court improperly denied his motion to suppress his oral and written statements to the police. Specifically, he claims that because of his physical and mental condition, his statements were involuntary in violation of the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut.[2] We do not agree.

The following additional facts are relevant to our resolution of this claim. After his surgery, the defendant told the Hartford police officer guarding his door that he wanted to speak with the officers who had obtained the warrant for his arrest. The police officer called the Hartford police station twice to inform detectives that the defendant wanted to speak with them. During the second call, the defendant got on the phone and Detective James Rovella asked him if he felt well enough to talk to the police. The defendant responded that although he thought he was under medicated, he wanted Rovella to come to the hospital to speak with him.

---

[1] The defendant was sentenced to fifty years for felony murder, fifteen years for conspiracy to commit robbery, fifteen years for attempt to commit robbery in the first degree and five years for carrying a pistol or revolver without a permit for a total of eighty-five years imprisonment before the imposition of sentence enhancements.

[2] "Because the defendant has not briefed his claim separately under the Connecticut constitution, we limit our review to the United States constitu-

When Rovella and another detective arrived at the hospital, they read the defendant his rights, provided him with a waiver of rights form and asked the defendant to read it aloud. The defendant initialed each section of the waiver form and signed on the bottom. The defendant also stated that he understood his rights because he had been arrested before. At the defendant's request the detectives loosened his leg shackle to make him more comfortable. After signing the waiver form, the defendant asked, "How would somebody catch a warrant for murder if he was shot in Middletown, Connecticut?" Rovella told the defendant that he would terminate the interview if that is all the defendant wanted to ask him. The defendant indicated that he wanted to continue and proceeded to give his statement to the detectives.

"We review a trial court's findings and conclusions regarding a motion to suppress using a well established standard. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . " (Internal quotation marks omitted.) *State* v. *Miller*, 67 Conn. App. 544, 547, 787 A.2d 639, cert. denied, 259 Conn. 923, 792 A.2d 855 (2002).

"Because the defendant was in custody and was properly advised of his *Miranda*[3] rights, our resolution of his claim requires us to determine whether he made a valid waiver of his rights. Pursuant to the fifth and fourteenth amendments to the United States constitution, a statement made by a defendant during custodial interrogation is admissible only upon proof that he . . .

tion." (Internal quotation marks omitted.) *State* v. *Jones*, 65 Conn. App. 649, 652 n.6, 783 A.2d 511 (2001).

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

waived his rights [under *Miranda*] . . . . To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation. . . . Furthermore, [a] defendant's express written and oral waiver is strong proof that the waiver is valid." (Internal quotation marks omitted.) *State* v. *Williams*, 65 Conn. App. 59, 72–73, 782 A.2d 149, cert. denied, 258 Conn. 923, 782 A.2d 1251 (2001).

In the present case, the court took into consideration that the defendant prompted two calls to the police to request to speak with them. With regard to the medicated state that the defendant was in, the court stated:

"[I]t does not, in and of itself, render a subsequent admission inadmissible. It may be one factor in determining the voluntariness. . . . It appears he was not in pain. There was no slurring of speech. He seemed to be alert. No drowsiness. He was breathing normally. Defendant appeared to be extremely rational. Showed no confusion. Appeared to understand all the detective's questions and the procedure that was going on." The court further found that there was no evidence of police coercion. The detectives made no threats or promises and the defendant was not deprived of any personal comforts. The court ultimately found that "[t]he state has demonstrated that . . . the defendant understood his rights and the waiver of those rights. Defendant understood and voluntarily waived his *Miranda* rights."

The record discloses no evidence of threats, promises or coercive or deceptive measures employed by the police in an attempt to elicit a confession from the defendant. We see no coercion in their terminating an interview that the defendant requested if they have no interest in taking time with particular questions that the defendant posed. See *State* v. *Jones,* 205 Conn. 638, 641–57, 534 A.2d 1199 (1987). Furthermore, the defendant initiated the interview with the detectives and seemed coherent and lucid despite his medications. In fact, the defendant made a series of statements in which the common thread was his desire to shift responsibility to others. These statements were a positive indication of the defendant's coherence. Our scrupulous review of the record leads us to conclude, as did the court, that the defendant's statements were voluntarily made, and that he voluntarily, knowingly and intelligently waived his *Miranda* rights.

The defendant further claims that a written statement that he gave at the police station was tainted by his earlier oral statement given to the police at the hospital

in violation of his *Miranda* rights. Two days after the incident, the defendant was discharged from the hospital and taken to the Hartford police station under the warrant that had been issued. The defendant filled out another waiver of rights form and signed it. Two detectives took a written statement from the defendant that essentially documented his oral statement given at the hospital. Under the circumstances, we conclude that the defendant was properly advised of his rights and that he made a knowing and voluntary waiver of those rights. Furthermore, because we already determined that the defendant's oral statement given at the hospital did not violate his *Miranda* rights, it did not taint his subsequent statement at the police station.

II

The defendant next claims that the court improperly denied his motion to suppress the identification testimony of Couloute and Staunton.[4] He claims that the identifications were so impermissibly suggestive and unreliable that they violated his constitutional rights under the fifth and fourteenth amendments to the

[4] The state claims that the defendant conceded this issue at trial and, therefore, this court should decline to review it. While the trial court was hearing exceptions to the jury instructions, the state raised a concern about the jury charge on identifications. The following colloquy occurred:

"The Court: I realize there's—there's a charge for identification. I did not think it was an issue here.

"[Defense Counsel]: Judge, and identification really hasn't been raised as a defense here. And other than the fact that identification is always an issue in a criminal case, but that's—

"The Court: But—

"[Defense Counsel]: We're not asserting that there's been a misidentification."

We do not consider defense counsel's statement that he was not asserting that there was a misidentification as a waiver of the defendant's claim that the identification was impermissibly suggestive and unreliable. We consider those claims as separate and distinct and, therefore, we will review the defendant's claim because it was not waived at trial and was preserved properly for this appeal.

United States constitution and article first, §§ 8 and 9, of the constitution of Connecticut.[5] We do not agree.

The following additional facts are relevant to our resolution of this claim. Detective Rovella drove Couloute and Staunton to the hospital to identify the defendant. At the hospital, Rovella took each witness in separately to look at the defendant. The defendant was lying in a bed with a sheet pulled up to his neck so that the witnesses could not see the nature and location of his injuries. Both Couloute and Staunton identified the defendant as the man they saw lying on the ground at the scene of the shooting. At the suppression hearing, both men testified that, despite the sheet that was covering the defendant, they could see that he had an injury to his leg. Rovella testified that he did not make up an array of photographs because he believed that it would have taken too long to obtain a photograph of the defendant.

"When a trial court denies a motion to suppress a pretrial identification, the standard of review is well established. Upon review of a trial court's denial of a motion to suppress, [t]he court's conclusions will not be disturbed unless they are legally and logically inconsistent with the facts. . . . [W]e will reverse the trial court's ruling [on evidence] only where there is abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of fact-bound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts

---

[5] We again limit our review to the United States constitution because the defendant failed to brief the claim separately under the Connecticut constitution. See footnote 2.

unless the record reveals clear and manifest error. . . .
Because the issue of the reliability of an identification
involves the constitutional rights of an accused . . .
we are obliged to examine the record scrupulously to
determine whether the facts found are adequately sup-
ported by the evidence and whether the court's ultimate
inference of reliability was reasonable. . . .

"Additionally, we note the applicable law that is rele-
vant to a determination of whether [an] identification
was properly admitted into evidence. [T]he required
inquiry is made on an ad hoc basis and is two-pronged:
first, it must be determined whether the identification
procedure was unnecessarily suggestive; and second,
if it is found to have been so, it must be determined
whether the identification was nevertheless reliable
based on an examination of the totality of the circum-
stances. . . . To prevail on his claim, the defendant
has the burden of showing that the trial court's determi-
nations of suggestiveness and reliability both were
incorrect." (Citation omitted; internal quotation marks
omitted.) *State* v. *Iannazzi*, 68 Conn. App. 456, 460–61,
791 A.2d 677 (2002).

We must first determine whether the identifications
in this case were unnecessarily suggestive. Our
Supreme Court has repeatedly stated that "generally a
one-to-one confrontation between a [witness] and the
suspect presented to him for identification is inherently
and significantly suggestive because it conveys the mes-
sage to the [witness] that the police believe the suspect
is guilty." (Internal quotation marks omitted.) *State* v.
*Austin*, 244 Conn. 226, 247, 710 A.2d 732 (1998). "Upon
finding suggestive circumstances, courts have then
asked whether such circumstances were impermissible
or unnecessary. . . . Hospital room show-ups have
been upheld as necessary where a serious injury has
disabled the witness or defendant. . . . In other
instances, however, hospital show-ups have been con-

sidered unnecessary because the suspect or witness has been in no immediate danger of death." (Citations omitted.) *State* v. *Mitchell*, 204 Conn. 187, 201, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987).

Our Supreme Court, however, has held that "even a suggestive procedure orchestrated by the police is permissible if exigent circumstances compel its use . . . . In the past, when we have been faced with the question of whether an exigency existed, we have considered such factors as whether the defendant was in custody, the availability of the victim, the practicality of alternate procedures and the need of police to determine quickly if they are on the wrong trail." *State* v. *Holliman*, 214 Conn. 38, 47–48, 570 A.2d 680 (1990).

In this case, the police were looking for a murder suspect and it was crucial to ascertain quickly whether the defendant was the man responsible so that, if he were not, the search to find and apprehend the responsible person could resume with a minimum of delay. Under the circumstances, we conclude that although the hospital identifications were suggestive, they were not unnecessarily so because of the exigent circumstances. Even if we were to assume that the identifications were unnecessarily suggestive, we would conclude that under the totality of the circumstances, the identifications were sufficiently reliable.

"[R]eliability is the linchpin in determining the admissibility of the identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [witness] to view the criminal at the time of the crime . . . the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the

[identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Salmon*, 66 Conn. App. 131, 136, 783 A.2d 1193 (2001), cert. denied, 259 Conn. 908, 789 A.2d 997 (2002).

The court found that "[i]n view of the totality of the circumstances . . . I don't necessarily dismiss . . . that . . . this matter was unnecessarily suggestive. I go to the reliability and find that the identification of the defendant by both witnesses was sufficiently reliable under the totality of the circumstances to warrant its admission." To support its conclusion that the identifications were reliable, the court considered the accuracy of the witnesses' prior description of the defendant, the level of certainty of the witnesses at the confrontation and the length of time between the crime and the confrontation. On the basis of our review of the record, we conclude that the identifications were reliable.

The court reasonably could have found from the totality of the circumstances that, while the identification procedure may have been suggestive, the identifications were nonetheless sufficiently reliable. Accordingly, we conclude that the court properly denied the defendant's motion to suppress.

### III

The defendant next claims that the court improperly enhanced his sentence under § 53-202k[6] because the issue of the sentence enhancement was not presented to the jury. The defendant also claims that the court improperly imposed three separate enhancements under § 53-202k. He asserts that these improprieties

---

[6] General Statutes § 53-202k provides in relevant part: "Any person who commits any class A, B or C felony and in the commission of such felony uses . . . any firearm . . . shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

violated his constitutional rights[7] and that, consequently, the enhancements under § 53-202k must be vacated. We disagree.

### A

The defendant concedes that he failed to preserve his first claim with respect to § 53-202k at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[8] We review the claim because the record is adequate for review and it is of constitutional magnitude. We conclude, however, that the claim fails under the fourth prong of *Golding*.

Our disposition of the defendant's first claim is controlled by our Supreme Court's holding in *State* v. *Montgomery*, 254 Conn. 694, 759 A.2d 995 (2000). In *Montgomery*, our Supreme Court recognized that "the jury and not the trial court must make the factual determinations required under § 53-202k . . . ." Id., 735. The Supreme Court determined, however, that the trial court's failure to submit the issue of sentence enhancement pursuant to § 53-202k to the jury was harmless error because the jury necessarily had made all the factual findings to support an imposition of an enhanced sentence under the statute. Id., 738.

---

[7] The defendant claims the court's determination that he was in violation of General Statutes § 53-202k violated his constitutional rights under the fifth, sixth and fourteenth amendments to the United States constitution, and article first, §§ 8, 9 and 19, of the constitution of Connecticut.

[8] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

Applying the analysis set forth in *Montgomery*, we conclude that, in the present case, the court's failure to submit the issue of the applicability of § 53-202k to the jury and its imposition of an enhanced sentence under the statute was harmless error. The "application of § 53-202k depends on factual findings concerning the two elements of that statute: (1) that the defendant committed a class A, B or C felony and (2) that the defendant committed such felony with the use of a firearm." *State* v. *Roman*, 67 Conn. App. 194, 210, 786 A.2d 1147 (2001), cert. granted on other grounds, 259 Conn. 920, 791 A.2d 567 (2002). First, the jury necessarily found that the defendant had committed a class A felony and two class B felonies. Second, because the defendant did not contest the fact that the victim died as a result of wounds caused by a firearm and the jury found the defendant guilty of felony murder, attempt to commit robbery in the first degree and conspiracy to commit robbery in the first degree, the court's failure to instruct the jury on the elements of § 53-202k was harmless beyond a reasonable doubt.

We conclude that the jury would have found that the defendant was subject to a sentence enhancement under § 53-202k had it been instructed properly on the elements of that statute. Accordingly, the defendant's claim fails under the fourth prong of *Golding*.

B

The defendant also claims that the court improperly imposed three separate enhancements under § 53-202k. We disagree.

At the outset, we note that our Supreme Court, in *State* v. *Dash*, 242 Conn. 143, 698 A.2d 297 (1997), concluded that § 53-202k is a sentence enhancement, not a separate felony offense. In addition, our Supreme Court has held that the application of the sentence enhancement provision of § 53-202k does not violate

double jeopardy principles. *State* v. *McMahon*, 257 Conn. 544, 559, 778 A.2d 847 (2001), cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002).

In *State* v. *Davis*, 255 Conn. 782, 783–84, 772 A.2d 559 (2001), the defendant was convicted of robbery in the first degree and burglary in the first degree and the court imposed two additional five year terms of imprisonment for the commission of a class A, B or C felony with a firearm, pursuant to § 53-202k. Although the court did not address the issue presently before us, we find it instructive that, in *Davis*, our Supreme Court implicitly upheld the validity of multiple enhancements under § 53-202k.

Under the plain language § 53-202k, the legislature imposed the sentence enhancement for a person who commits "*any* class A, B or C felony" with a firearm "consecutive to *any* term of imprisonment imposed for conviction of such felony." (Emphasis added.) In using the word "any," the legislature clearly expressed its intent to provide for an enhancement of each qualifying conviction.

Our examination of the legislative history of § 53-202k also supports our conclusion that multiple enhancements are permitted under the statute. It is clear that the legislature's purpose in enacting the statute was to increase the penalties for crimes committed with the use of firearms. *State* v. *McMahon*, supra, 257 Conn. 561–62. Section 53-202k "adds five years to the end of whatever other sentence you are receiving as a consequence of these acts. . . . So that would be in addition to the minimum mandatories that are already in existence for whatever the underlying crime was. So, it is five additional years on top of the other sentence." 36 H.R. Proc., Pt. 33, 1993 Sess., pp. 11727–28, remarks of Representative Michael P. Lawlor.

On the basis of *Davis* and the plain language and legislative history of § 53-202k, we conclude that the

court properly imposed three separate enhancements under the statute.

## IV

The defendant next claims that the court violated his due process rights under the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut when it instructed the jurors to consider each other's feelings while deliberating. We disagree.

The defendant failed to preserve this claim at trial and now seeks review under *Golding*[9] or, alternatively, under the plain error doctrine. See Practice Book § 60-5. We will review the claim because the record is adequate for our review and the claim is of constitutional magnitude. We conclude, however, that the claim fails under the third prong of *Golding*.

"When reviewing the challenged jury instruction, however, we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Citations omitted; internal quotation marks omitted.) *State* v. *George B.*, 258 Conn. 779, 797, 785 A.2d 573 (2001).

---

[9] See footnote 8.

The defendant challenges the following portions of the court's statements to the jury: "[W]ith regard to your deliberations, I am directing that you continue to deliberate, considering all the evidence that you have before you and all the opinions, feelings of all the people that you have here, and each of you listening to each other and taking into consideration, and in your deliberations, as I have directed you before. And then making your decision. So at this time, I will order that you continue deliberating and excuse you to the deliberating room." "With that I will excuse you for the day and just ask you to think about—think about this tonight. I know you will. I'm certainly not telling you anything you won't do. But think deeply about it and how people feel about it and how each of you feel about it, and—see if there's any—in your mind, if there's any common ground and so on. And when you get back together tomorrow morning at 10 to see—see where you are then." "Ladies and gentlemen, I'm going to excuse you into the deliberating room in a moment. Before I do, let me advise you that I am going to do that because you've had the overnight to think about this and— and perhaps a new approach or something to this matter, and in order to break the impasse that you mentioned yesterday you were still at. But I would advise that you should take another look at this when you're all there and deliberate for a period of time. And it—I'm leaving that up to you."

Our Supreme Court, in *State* v. *Feliciano*, 256 Conn. 429, 441–42, 778 A.2d 812 (2001), stated: "By asking the jurors to consider the views and arguments of others, the court's instructions embodied the very essence of the jury system, which is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. . . . It would defy logic to suggest that a juror should not listen with deference to the views of others, particularly when a majority of the others holds a different view of the case than his own.

No juror should possess the blind determination that the verdict shall represent his opinion, deaf to those whose equal intelligence and integrity have brought them to a different place. . . . The charge in the present case, when read as a whole, properly informed the jury that each member had the individual responsibility to consider the opinion of the others and to satisfy him or herself of the correctness of his or her opinion *and* not merely to acquiesce in the conclusion of others." (Citations omitted; emphasis added; internal quotation marks omitted.)

We conclude, therefore, that the record does not support the defendant's claim under *Golding* that a constitutional violation clearly exists and clearly deprived him of a fair trial, nor does it give rise to plain error because the instructions did not affect the fairness or integrity of the proceedings or result in a manifest injustice to the defendant. See *State* v. *Ryan*, 53 Conn. App. 606, 612–13, 733 A.2d 273 (1999).

V

Finally, the defendant claims that the court improperly refused to issue the defendant's requested instruction to the jury but instead gave a "Chip Smith" charge.[10] See *State* v. *Smith*, 49 Conn. 376, 386 (1881). This claim has no merit.

After two days of deliberating, the jury informed the court that it had reached an impasse. The court gave a "Chip Smith" charge despite the defendant's objection and written request to charge in an alternative manner.[11]

[10] "A 'Chip Smith' instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity. See D. Borden & L. Orland, 5 Connecticut Practice Series: Connecticut Criminal Jury Instructions (2d Ed. 1997) §§ 4.4 and 4.5." *State* v. *Anderson*, 65 Conn. App. 672, 682 n.5, 783 A.2d 517 (2001).

[11] The court's instruction was as follows: "Ladies and gentlemen, certainly I've had—I have your message, and I've had your messages, that you are unable to reach a unanimous verdict in some parts of this matter perhaps.

"Although the verdict to which each of you agrees must express his or

Although the defendant concedes that the "Chip Smith" charge has been approved on numerous occasions by our Supreme Court; see, e.g., *State* v. *Feliciano*, supra, 256 Conn. 439; he argues that it suggested to the jury that a majority rule should be given some kind of greater weight.

Our decision in *State* v. *Lyons*, 36 Conn. App. 177, 188, 649 A.2d 1046 (1994), is dispositive of this claim. In *Lyons*, we stated: "[The Chip Smith charge] in no way coerces dissenting jurors into subverting their opinions to those of the majority, but urges each juror to consider the questions before the jury with due regard and deference to the opinions of each other in an effort to arrive at a unanimous verdict. Although the charge does call on dissenting jurors to reevaluate their conclusions, such a charge is not coercive when considered in its totality." (Internal quotation marks omitted.) Id.

her own conclusion and not be a mere acquiescence in the conclusions of your fellow jurors, yet in order to bring twelve minds to a unanimous result, you should consider the question you have to decide, not only carefully, but also with due regard and deference to the opinions of one another.

"In conferring together, you ought to pay proper respect to each other's opinions and listen with an open mind to each other's arguments. If most of you reach a certain conclusion, a dissenting juror or jurors should consider whether his or her opinion is a reasonable one when the evidence does not lead to a similar opinion in the minds of other jurors who are men and women who are equally honest and equally intelligent, who have heard the same evidence with the same attention, with equal desire to arrive at the truth and under the sanction of the same oath.

"If a majority of you are for one position, the minority ought to seriously ask themselves whether, in reason, they should adhere to their own conclusions when those conclusions are not concurred in by most of those with whom you are associated, and whether it might not be well to distrust the weight or sufficiency of the evidence upon which the minority rely when that evidence fails to bring the minds of their fellow jurors to the same conclusion as they have reached.

"Now, I will repeat that each of you must express your own—his or her own conclusion, but give consideration to these things I have just outlined to you.

"With that, I'm going to send you back to resume deliberations. And I ask you to consider, among the other instructions and the evidence you have, this further instruction that I have just given you. And we will await your communication."

Accordingly, we conclude that the "Chip Smith" charge as given in this case was appropriate and proper and the defendant's claim that his due process rights were violated is, therefore, meritless.

The judgment is affirmed.

In this opinion the other judges concurred.