STATE OF CONNECTICUT *v.* JOSEPH
FRANCIS CARCARE
(AC 22173)

Schaller, West and Shea, Js.

---

Argued October 28, 2002—officially released April 1, 2003

*Dennis P. McDonough*, special public defender, for the appellant (defendant).

*Melissa L. Streeto*, special deputy assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *Warren C. Murray*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Joseph Francis Carcare, appeals from the judgment of conviction, rendered after a jury trial, of burglary in the third degree in violation of General Statutes § 53a-103, credit card theft in violation of General Statutes § 53a-128c (a) and larceny in the fifth degree in violation of General Statutes § 53a-125a.[1] On appeal, the defendant claims (1) that the trial court improperly denied his motion to suppress items seized from his motor vehicle and his written statement to the police, (2) that the court denied his motion for a judgment of acquittal as to the charge of larceny in the fifth degree and (3) that there was insufficient evidence to support his conviction of larceny in the fifth degree.

The jury reasonably could have found the following facts. On June 20, 2001, between the hours of 10 a.m. and 1 p.m., a burglary was committed at a residence located at 102 East Pembroke Road in Danbury. At that time, William Gotthardt and Winifred Gotthardt, who

---

[1] The jury also found the defendant guilty of charges alleged in the second part of the information that he had been convicted previously of the same offense as that set out in the first part of the information or that he was charged with an offense in the first part of the information for which the state sought an enhanced penalty. The defendant previously had been convicted of two counts of larceny in the sixth degree in violation of General Statutes § 53a-125b.

lived at that address, were attending the funeral of their son, John Gotthardt (decedent), who had resided with them. When members of the family returned to the house, they discovered that someone had broken a window in the back door. At 1:20 p.m., a member of the family telephoned the Danbury police department to report the break-in.

By 2 p.m. both Jeffrey Lee, a Danbury police officer, and James Terry, a police detective, had arrived at the home. The officers noted that pieces of broken glass from the back door contained blood and fragments of hair, indicating that the perpetrator probably had been injured while breaking into the house. The family and the police officers walked through the house and discovered that the decedent's wallet, containing two credit cards, approximately $250 and miscellaneous identification, had been stolen. Clothing belonging to the decedent was also taken.

The decedent's sister reported the theft of the credit cards to the issuers of the cards shortly after 2 p.m. and was informed of recent activity on one of the decedent's accounts. Terry spoke to a representative of the credit card issuer and learned that the card had been used at a Citgo gasoline station in Danbury. Several purchases were made there in the name of the decedent. Terry instructed the issuer of the credit card to inform the family if additional charges were made to the account.

Terry left the home and called on several Citgo service stations in the vicinity. At 3:15 p.m., he discovered that the decedent's credit card had been used at the Citgo station on Main Street in Danbury. Terry obtained copies of the credit card receipts, which revealed that the purchases had been signed for in the name of the decedent. The attendant at the service station described the individual who had used the credit card as a His-

panic male, approximately twenty years old, driving a gold colored Hyundai.

Terry returned to the police station shortly after 4 p.m. to attend the shift change meeting and to provide information about the burglary to officers coming on duty at that time. Terry also met with Detective Robert Yakacki to inform him of the investigation and to provide him with a description of the suspect.

While he was at the station, Terry received information about additional use of the decedent's credit cards in the Danbury area. Terry learned that charges had been made on the cards at a BP gasoline station, a Bradlees department store, a Service Merchandise store, a Ritz Camera store and a Getty gasoline station. All of these businesses are adjacent to Newtown Road in Danbury. Terry left the police station to continue his investigation at these businesses. Yakacki went to patrol the vicinity of the gasoline service stations, hoping that the perpetrator of the crimes was still in the area.[2]

Terry's investigation revealed that beginning at about 3 p.m. that day, someone had made purchases with the decedent's credit cards at each of the aforementioned businesses. The individual making the purchases had used the cards by signing the decedent's name. An employee of Ritz Camera informed Terry that the person who had purchased a camcorder there was a well tanned white male, who was approximately sixty years old and wearing a red shirt.[3]

In the meantime, Yakacki had been patrolling Main Street in the area of the Citgo gasoline station. At

---

[2] In fact, the defendant periodically stopped at self-service gasoline stations to use the device at the pump to determine whether the credit cards were still valid.

[3] At the time the defendant was arrested, he was photographed. In the photograph, he appears to be well tanned and wearing a red shirt and a gold chain.

approximately 6 p.m., he saw a gold colored Hyundai that matched the description of the suspect's vehicle. Yakacki recognized the individual in the operator's seat as the defendant, due to the defendant's extensive criminal past. Yakacki saw the Hyundai go through a red traffic control signal. Yakacki followed the vehicle and instructed the defendant to drive to the side of the road. Yakacki also observed a large box bearing a Bradlees sticker in the backseat of the vehicle. The box appeared to contain a television or other large appliance. Yakacki was aware that Bradlees was one of the businesses where the decedent's credit card had been used that afternoon because Terry had used his police radio to broadcast the results of his investigation.

Yakacki asked the defendant to produce his operator's license, which the defendant did. Yakacki saw a large gash on the defendant's left forearm and asked the defendant to step out of the vehicle.

Shortly after Yakacki stopped the defendant, Sergeant Adam Fernand of the Danbury police department arrived to assist Yakacki. Fernand, too, noticed the box bearing the Bradlees sticker in the rear of the vehicle, as well as a paper towel on the front seat that appeared to be covered with blood. Fernand also recognized the defendant from his prior arrests and asked the defendant whether there was anything in the vehicle that the officers should be concerned about, such as illegal drugs or weapons. The defendant responded in the negative. Fernand then asked the defendant for permission to search the vehicle. The defendant gave Fernand permission to search the vehicle. Almost immediately after Yakacki began his search, he found two of the decedent's credit cards behind a sun visor over the operator's seat. Fernand placed the defendant under arrest while Yakacki read him his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d

694 (1966). The officers transported the defendant to the Danbury police station.

At the police station, Terry met the defendant, whom he had known for ten years, and advised him again of his constitutional rights pursuant to *Miranda*. The defendant stated that he understood his rights and signed a notice of rights form. Terry interviewed the defendant, who gave Terry a written statement. In his statement, the defendant admitted that he was involved in the burglary and that he had used the decedent's credit cards to make purchases at Bradlees (television set), Service Merchandise (gold chain) and Ritz Camera (camcorder).

The jury returned a verdict of guilty, and the defendant received an effective sentence of ten years in prison and was required to make restitution of $250 to the victims of the burglary. The defendant appealed to this court. Additional facts will be addressed where they are needed.

I

The defendant first claims that the court improperly denied his motion to suppress the evidence found in his vehicle at the time Yakacki searched it and the written statement the defendant gave to Terry. The defendant argues that (1) his state and federal constitutional rights were violated by Yakacki, who did not have a reasonable and articulable suspicion to detain the defendant, (2) the defendant did not voluntarily consent to the search of his vehicle and (3) the evidence and his written statement, therefore, were the fruit of illegal police activity and should have been suppressed. We disagree with the defendant's claim.

Prior to the start of evidence at trial, the defendant filed a motion to suppress the evidence of the stolen credit cards and his written statement. The court con-

ducted a suppression hearing on May 4, 2001, and rendered its decision orally from the bench the next court day. At the suppression hearing, the state offered the testimony of Lee, Terry, Yakacki and Fernand.

A

We first turn our attention to the procedural difficulties presented by the defendant's claim related to the motion to suppress. Practice Book § 64-1 provides that in ruling on a motion to suppress, the court shall state its decision orally or in writing. It also provides that if the decision is given orally and an appeal is taken, the court shall create a memorandum of decision by ordering the court reporter to transcribe the decision, which the court shall sign. Here, the court did not sign the transcript of its decision, and the defendant apparently took no steps to provide this court with a signed transcript of the trial court's decision. It is the appellant's responsibility to provide an adequate record for our review. Practice Book § 61-10; see *State* v. *Duteau*, 68 Conn. App. 248, 253, 791 A.2d 591 (setting out procedure for providing adequate record), cert. denied, 260 Conn. 939, 835 A.2d 58 (2002).

"While we do not condone the court's failure to comply with [Practice Book § 64-1] . . . we would not exalt form over substance if the deficiency were of a technical nature." (Internal quotation marks omitted.) *State* v. *Duteau*, supra, 68 Conn. App. 253. The defendant's failure to provide us with a signed copy of the court's decision is not fatal to his appeal, as it is of a technical nature. The defendant has provided us with an unsigned copy of the transcript of the court's decision, which "provides an adequate basis from which to glean the trial court's rationale"; *State* v. *Breckenridge*, 66 Conn. App. 490, 495 n.3, 498 n.5, 784 A.2d 1034, cert. denied, 259 Conn. 904, 789 A.2d 991 (2001); for denying the motion to suppress. We, therefore, will review the defendant's claim.

B

"On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence. . . . [W]e engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . We give great deference to the findings of the trial court because it weighs the evidence before it and assesses the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Nieves*, 65 Conn. App. 212, 216, 782 A.2d 203 (2001).

In addition to the facts the jury reasonably could have found, the court found the following facts and made conclusions of law as follows. At the time he was on patrol and stopped the defendant, Yakacki knew· that the site of the burglary was approximately five miles from the place where he saw the defendant operating a gold colored Hyundai. That location also was three quarters of a mile from the Main Street Citgo gasoline station where the decedent's credit card had been used at about 3 p.m. and about three miles from the Bradlees store where one of the decedent's credit cards was used to purchase a television set.

When Yakacki stopped the defendant, he noticed two wallets on the console of the vehicle. Yakacki asked the defendant where he had acquired the television set. The defendant responded that he had obtained it from a man on Foster Street in Danbury. Both Yakacki and Fernand knew of the defendant's history of drug use and larceny arrests. At the time the defendant gave Fernand permission to search the vehicle, both Yakacki

and Fernand observed that the defendant was calm and sober. The defendant appeared to understand his rights and voluntarily gave permission to Yakacki to search the vehicle. After the defendant had been arrested and informed of his constitutional rights a second time, the defendant voluntarily waived his rights and gave a written statement to Terry.

The court addressed the defendant's argument that the description of the suspect provided by the attendant at the Citgo service station did not describe the defendant. Specifically, Terry had told Yakacki that the attendant described the suspect as a young Hispanic male. The defendant was a fifty-seven year old Caucasian male. The court concluded that the discrepancy did not take away from the reasonable and articulable suspicion held by Yakacki when he stopped the defendant. The court cited *State* v. *DaEria*, 51 Conn. App. 149, 721 A.2d 539 (1998), in support of its conclusion. "The police . . . are not required to confirm every description of the perpetrator that is broadcast over the radio. What must be taken into account [when determining the existence of a reasonable and articulable suspicion] is the strength of those points of comparison which do match up and whether the nature of the descriptive factors which do not match is such that an error as to them is not improbable . . . . *State* v. *Rodriguez*, 239 Conn. 235, 246–47 n.18, 684 A.2d 1165 (1996); *State* v. *Kyles*, [221 Conn. 643, 663, 607 A.2d 355 (1992)]; 3 W. LaFave, Search and Seizure (2d Ed. 1987) § 9.3 (d), pp. 465–66." (Internal quotation marks omitted.) *State* v. *DaEria*, supra, 158–59.

In acknowledging the improbability of the descriptive factors of the suspect and the defendant that did not match, the court reasoned that there were more important facts to be considered. The defendant was operating a vehicle that matched the description of the vehicle the suspect was seen to be operating. Yakacki

saw the vehicle close in time and geographical proximity to the places were the decedent's credit cards had been used. The court concluded that Yakacki had the right to stop the defendant for a motor vehicle violation when the defendant drove through a red traffic signal.[4]

Under the circumstances in which the officers observed a large appliance box bearing a Bradlees sticker on the rear seat, a bloody paper towel in the vehicle and a gash on the defendant's left arm, the court concluded that Yakacki and Fernand had a reasonable and articulable basis for suspecting that the defendant had been involved in or was about to be involved in criminal activity and properly requested to search the vehicle. The court also concluded that when Yakacki found the stolen credit cards, the officers had probable cause to arrest the defendant without a warrant.

The court also found that Yakacki and Fernand both knew the defendant, and had observed that the defendant was calm and sober at the time he consented to the search of the vehicle. The court concluded, therefore, that the defendant's consent was freely and voluntarily given. As to the defendant's written statement, the court found that Terry orally had informed the defendant of his rights pursuant to *Miranda* at the police station. Terry also gave the defendant an opportunity to review a waiver of rights form, which the defendant reviewed and signed. Yakacki, who witnessed the defendant's signing of the waiver of rights form, and Terry agreed that the defendant appeared to be calm and sober and to understand the ramifications of waiving his rights. The court concluded that the defendant voluntarily waived his rights and gave the written statement to Terry. The court, therefore, denied the motion to suppress.

---

[4] The defendant has conceded that Yakacki had the right to stop him for driving through the red traffic signal. See *State* v. *Lizotte*, 11 Conn. App. 11, 15, 525 A.2d 971, cert. denied, 204 Conn. 806, 528 A.2d 1154 (1987).

On the basis of our review of the evidence presented at the suppression hearing and the transcript of the court's decision, we conclude, in summary, that the court properly denied the defendant's motion to suppress. We agree with the court that Yakacki had a reasonable and articulable suspicion to believe that the defendant had been involved in a crime or was about to commit one. Furthermore, the defendant consented to the search of his vehicle and voluntarily gave a written statement to Terry. The evidence Yakacki found in the vehicle and the defendant's statement, therefore, were not the fruit of an illegal police search.

1

We begin our analysis by addressing the defendant's claim that the scope of the stop and his detention was unjustified. He argues that beyond the traffic stop, Yakacki and Fernand had no reasons to suspect he had been involved in any other crime. "In reviewing the police officer's actions in this case, we must determine, first, whether the stop was justified at its inception and whether the ensuing police response was 'reasonably related in scope to the circumstances which justified the interference in the first place.' *Terry* v. *Ohio*, 392 U.S. 1, 19–20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). This analysis requires our examination of the facts available to the police officer and any rational inferences derived therefrom. *State* v. *Aillon*, [202 Conn. 385, 399, 521 A.2d 555 (1987)]." *State* v. *Anderson*, 24 Conn. App. 438, 442, 589 A.2d 372, cert. denied, 219 Conn. 903, 593 A.2d 130 (1991).

The defendant argues that the officers' search went beyond the reason for the initial stop. "A *Terry* stop that is justified at its inception can become constitutionally infirm if it lasts longer or becomes more intrusive than necessary to complete the investigation for which that stop was made. . . . Like the determination of the ini-

tial justification, this inquiry is fact-bound. . . . The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. . . . If . . . the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances. . . . One function of a constitutionally permissible *Terry* stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. A police officer who has proper grounds for stopping a suspect has constitutional permission to immobilize the suspect briefly in order to check a description or an identification, so long as his conduct is strictly tied to and justified by the circumstances which rendered its initiation permissible. . . . Determination of the means that are reasonably necessary to maintain the status quo necessarily depends on a fact-bound examination of the particular circumstances of the particular governmental intrusion on the personal security of a suspect." (Citations omitted; internal quotation marks omitted.) *State* v. *Casey*, 45 Conn. App. 32, 40–41, 692 A.2d 1312, cert. denied, 241 Conn. 924, 697 A.2d 360 (1997).

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (Citation omitted.) *Adams* v. *Williams*, 407 U.S. 143, 145–46, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972).

At about 6 p.m. on June 20, 2000, when Yakacki stopped the defendant, he knew that the scene of the burglary, the locations of the various businesses where the decedent's credit cards had been used and the place where he first saw the gold colored Hyundai were within a five mile area. The cards had been used illegally that afternoon. After he stopped the defendant, Yakacki observed that the defendant had a cut on his left forearm and knew that the person who had broken into the decedent's residence had cut himself on the broken glass.

Yakacki saw that the appliance sized box bearing a Bradlees sticker in the rear of the vehicle contained a new television. Yakacki knew that Bradlees was one of the places where the decedent's credit cards had been used that afternoon. Yakacki asked the defendant where he got the television, and the defendant told him that he got it for $150 from a man on Foster Street in Danbury.

When Fernand arrived, he saw a bloody paper towel on the front seat of the vehicle. Although the description of the individual who had used the credit card at one of the service stations did not match that of the defendant, the color and make of his vehicle did.[5] The court properly analyzed the factors to be considered pursuant to State v. DaEria, supra, 51 Conn. App. 158. After the defendant had been stopped, the officers saw a large box from Bradlees, a bloody paper towel and an injury to the defendant's arm. Furthermore, both Yakacki and Fernand knew that the defendant had been involved in a number of larcenies and illegal drugs. The defendant denied that there would be anything of interest to them,

[5] With regard to the description of the suspect's being Hispanic, the court stated: "[A]s far as this court is concerned, the term Hispanic has cultural connotations and not always necessarily racial connotations in the sense that someone could be a black Hispanic or a Caucasian Hispanic or some other type of Hispanic, if you will."

such as drugs or weapons, in the vehicle. Although the defendant was initially stopped for a traffic infraction, Yakacki and Fernand were justified in detaining the defendant while they pursued their investigation of the burglary and illegal credit card use. Such a detention is a valid *Terry* stop. See *State* v. *Lamme*, 216 Conn. 172, 176, 579 A.2d 484 (1990).

2

The defendant also claims that his consent to search his vehicle was not freely given because he was not free to leave, although he had not yet been arrested. He claims in his brief that his consent was merely "submission to a claim of lawful authority," citing *Florida* v. *Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983).

The defendant relies on *State* v. *Oquendo*, 223 Conn. 635, 613 A.2d 1300 (1992), in support of his argument that he consented to the search because he thought that he was not free to leave. The relevant issue in *Oquendo* was the determination of whether a seizure had taken place. Id., 646–53.[6] The flaw in the defendant's argument here is that in *Oquendo*, the issue of seizure went to the question of whether the police officer had a reasonable and articulable suspicion to stop and detain the *Oquendo* defendant. The lawfulness of the defendant's seizure, however, is a question different from whether a consent to search was voluntary.

"A warrantless search is not unreasonable under the fourth amendment to the United States constitution

---

[6] *Oquendo*, in part, was an appeal from the trial court's denial of a motion to suppress. Our Supreme Court reversed the judgment of conviction, concluding that the police officer did not have a reasonable and articulable suspicion to stop the defendant, pursuant to the protections afforded by the constitution of Connecticut. *State* v. *Oquendo*, supra, 223 Conn. 646. There, our Supreme Court iterated the standards to determine whether a seizure had taken place. Id., 647.

when a person with authority to do so has freely consented. *State* v. *Martinez*, 49 Conn. App. 738, 743, 718 A.2d 22, cert. denied, 247 Conn. 934, 719 A.2d 1175 (1998). The question of whether a defendant has given voluntary consent to . . . search . . . is a question of fact to be determined by the trial court by considering the totality of the circumstances surrounding the . . . search. *State* v. *Vargas*, 34 Conn. App. 492, 496, 642 A.2d 47, cert. denied, 230 Conn. 907, 644 A.2d 921 (1994). The voluntariness of the consent is normally decided by the trial court based on the evidence it deems credible along with the reasonable inferences that can be drawn therefrom. *State* v. *Ortiz*, 17 Conn. App. 102, 103–104, 550 A.2d 22, cert. denied, 209 Conn. 828, 552 A.2d 1216 (1988)." (Internal quotation marks omitted.) *State* v. *Story*, 53 Conn. App. 733, 737–38, 732 A.2d 785, cert. denied, 251 Conn. 901, 738 A.2d 1093 (1999).

Here, the court found that both Yakacki and Fernand were familiar with the defendant, who had a criminal record of larceny. The officers observed that at the time they asked the defendant for permission to search his vehicle, the defendant was calm and sober. He appeared to understand his rights and he freely consented. Fernand asked the defendant whether he was in possession of any weapons or drugs or illegal items. The defendant said, "No." Fernand asked the defendant whether he would mind if the officers searched the vehicle, and the defendant indicated that he did not mind. The court found that the defendant voluntarily consented to the search and that he was not coerced or forced in any way to acquiesce to the search.

"No one factor is controlling on the question of voluntariness . . . ." (Citation omitted.) *State* v. *Cobbs*, 7 Conn. App. 656, 658–59, 510 A.2d 213 (1986), citing *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). "The determination to be made is whether the will of the consenting individual

was overborne, or whether the consent was his uncon-strained choice." *State* v. *Cobbs*, supra, 659. On the basis of our review of the evidence presented at the suppression hearing, we conclude that the court's find-ing that the defendant voluntarily consented to the search of his vehicle was not clearly erroneous. The four police officers were the only people to testify at the hearing, and the court obviously found their testimony credible. Credibility is a matter to be determined by the trier of fact. *State* v. *Rivera*, 74 Conn. App. 129, 136, 810 A.2d 824 (2002). Nothing in the record would lead us to conclude that the court's finding of credibility was clearly erroneous. The court, therefore, properly denied the defendant's motion to suppress as to whether the defendant's consent was voluntary.

### 3

The defendant also claims that because he did not freely consent to the search of the vehicle in which Yakacki found the decedent's credit cards, the search was illegal and that anything found pursuant to the search, as well as his arrest and subsequent written statement, was fruit of the poisonous tree. See *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). We have already determined that the defendant voluntarily consented to the search of his vehicle, and that the credit cards and his arrest were not fruit of the poisonous tree. We must now decide whether the defendant knowingly, intelligently and voluntarily waived his rights when he gave a written statement to Terry. We conclude that the defendant waived his constitutional rights.

"Pursuant to the fifth and fourteenth amendments to the United States constitution, a statement made by a defendant during custodial interrogation is admissible only upon proof that he . . . waived his rights [under *Miranda*] . . . . To be valid, a waiver must be volun-

tary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation. . . . Furthermore, [a] defendant's express written and oral waiver is strong proof that the waiver is valid." (Internal quotation marks omitted.) *State* v. *Davis*, 69 Conn. App. 717, 723–24, 796 A.2d 596, cert. granted on other grounds, 261 Conn. 904, 802 A.2d 854 (2002).

The court found that Terry had informed the defendant orally of his constitutional rights pursuant to *Miranda*. Terry also gave the defendant a notice of rights form that the defendant reviewed and signed. Yakacki witnessed the defendant's signing of the rights form and believed that the defendant understood what

he was doing. Terry, who knew the defendant from prior criminal matters, believed the defendant to be sober, calm and understanding of what he was doing, and that the defendant had waived his rights voluntarily. Terry observed the wound on the defendant's arm and offered to get the defendant medical assistance, which offer the defendant initially rejected.[7] The defendant did not ask for an attorney. In the statement he gave to Terry, the defendant acknowledged that he voluntarily had consented to the search of his vehicle. He also made incriminating statements about his participation in the burglary and that he had used the decedent's credit cards to make purchases.

On the basis of our review of the record and the transcript of the court's decision, we conclude that the court's finding that the defendant knowingly, intelligently and voluntarily gave a written statement was not clearly erroneous, considering the factors enumerated in *Davis*. The court, therefore, properly denied the defendant's motion to suppress.

II

The defendant's second and third claims are related to the court's denying his motions for a judgment of acquittal.[8] The defendant claims that the court improperly denied his motions for a judgment of acquittal (1) because one cannot be guilty of larceny in the fifth degree in violation of § 53a-125a by use of a credit card when the legislature specifically has proscribed the illegal use of a credit card in General Statutes § 53a-128d[9] and (2) because that there was insufficient evi-

[7] After he took the defendant's statement, Terry insisted that the defendant's injuries be treated medically.

[8] The defendant filed a motion for a judgment of acquittal at the conclusion of the state's evidence and after the jury returned its verdict.

[9] The defendant has provided no legal support for his claim that the legislature's enacting the more specific crime of illegal credit card use precludes the state from charging the defendant with the more general crime of larceny. We know of no legal basis for such a claim, and our review of the legislative history of our credit card crimes, General Statutes § 53a-128a

dence to prove beyond a reasonable doubt that he used the decedent's credit card to purchase the camcorder. We are not persuaded.

A

We first determine whether the defendant may be convicted of larceny in the fifth degree by illegal use of a credit card. We conclude that he may be so convicted.

The defendant was charged in count three of the information with larceny in the fifth degree. The crime occurred on June 20, 2000, at Ritz Camera in Danbury and concerned the theft of a camcorder. In his motion for a judgment of acquittal, the defendant argued that he cannot be convicted of larceny because the merchant parted with the camcorder willingly and knowingly. Furthermore, he continues, larceny is a theft crime that requires the state to prove that the defendant had a specific intent to deprive the owner of the camcorder and that there can be no theft if the owner consented to the defendant's taking the property.

Although the defendant asserted his claim in a motion for a judgment of acquittal on the basis of insufficient evidence, our standard of review regarding a motion for a judgment of acquittal; see part II B; does not apply to the defendant's actual claim. The defendant's claim calls into question whether § 53a-125a applies to the facts of this case. This is a question of law to which a plenary standard of review applies. See *State* v. *Hackett*,

---

et seq., reveals no such purpose or intent on the part of the legislature in passing the legislation.

"[D]uring deliberations on the legislation in the Senate, the law's purpose was broadly defined as '[giving] protection to the person, who perhaps loses his credit card through theft or other reason and to give him protection under the law . . . and to give equal results to responsible firms which are issuing credit through credit cards.' 13 S. Proc., Pt. 7, 1969 Sess., p. 3506, remarks of Senator John F. Pickett, Jr." *State* v. *Love*, 246 Conn. 402, 411, 717 A.2d 670 (1998). Senator Pickett also indicated that the new law was proposed in response to an ever changing society.

72 Conn. App. 127, 132, 804 A.2d 225, cert. denied, 262 Conn. 904, 810 A.2d 270 (2002).

"According to our long-standing principles of statutory [interpretation], our fundamental objective is to ascertain and give effect to the intent of the legislature. . . . In determining the intent of a statute, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." Id.; see also *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003) (en banc). "As with any issue of statutory interpretation, our initial guide is the language of the operative statutory provisions." (Internal quotation marks omitted.) *Fimiani* v. *Star Gallo Distributors, Inc.*, 248 Conn. 635, 642, 729 A.2d 212 (1999). "[A penal] statute should not be read so as to add to, or to subtract from that which is readily found therein." (Internal quotation marks omitted.) *State* v. *Ingram*, 43 Conn. App. 801, 825, 687 A.2d 1279 (1996), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997).

Section 53a-125a (a) provides in relevant part: "A person is guilty of larceny in the fifth degree when he commits larceny as defined in section 53a-119 and the value of the property or service exceeds two hundred fifty dollars." General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to . . . (2) Obtaining property by false pretenses. A person obtains property by false pretenses when, by *any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person.*" (Emphasis added.)

"The elements of larceny include: (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of the consent of the owner. . . . *State* v. *Huot*, 170 Conn. 463, 467–68, 365 A.2d 1144 (1976), quoting *State* v. *Banet*, 140 Conn. 118, 122, 98 A.2d 530 (1953). Consequently, a conviction for larceny [cannot] stand . . . [when the] property is taken with the knowing consent of the owner . . . . *State* v. *Marra*, 174 Conn. 338, 342, 387 A.2d 550 (1978)." (Internal quotation marks omitted.) *State* v. *Calonico*, 256 Conn. 135, 153, 770 A.2d 454 (2001). Felonious intent as applied to larceny means that there is no color of right or excuse for the act. Id., 162.

The question on which we focus is whether an individual can knowingly and willingly part with his or her property if he or she is defrauded by *any false token, pretense or device*. See General Statutes § 53a-119 (2). "A representation may be found to be false either expressly or by implication and may consist in any act, word, symbol, or token calculated and intended to deceive." *State* v. *Farrah*, 161 Conn. 43, 49–50, 282 A.2d 879 (1971). "[Larceny by trick] is committed when one obtains the possession of personal property of another by deception, artifice, fraud or force, with the intent on the part of the person obtaining it to convert it to his own use and permanently deprive the owner of his property. . . . When a person by trick or fraud obtains possession of property, intending at the time of obtaining the property to convert it to his own use, and does so convert it, the fraud is the equivalent of a felonious taking and the offense is larceny." (Citations omitted; internal quotation marks omitted.) *State* v. *Vars*, 154 Conn. 255, 260–61, 224 A.2d 744 (1966).

"Notwithstanding the general rule that larceny is not committed by a taking which is accomplished with the

consent or acquiescence of the owner of the property, the offense is larceny if the owner of goods parts with the possession only, for a particular purpose, and the person who receives the possession avowedly by for that purpose has a fraudulent intention to make use of it as the means of converting the goods to his own use, and does so convert them, for in such case the fraud supplies the place of the trespass in the taking, or as otherwise stated, the subsequent felonious conversion of the property by the alleged thief will relate back and make the taking and conversion larceny." (Internal quotation marks omitted.) Id., 261. "Title to money or other personal property delivered by the owner for use for, or application to, a special purpose does not necessarily pass to the person to whom the property is delivered and such person may be guilty of larceny where delivery was fraudulently induced." (Internal quotation marks omitted.) Id., 262.

We therefore conclude that the court properly denied the defendant's motion for a judgment of acquittal on the ground that he could not be convicted of larceny because the merchant at Ritz Camera willingly and knowingly parted with the camcorder.

### B

We determine now whether there was sufficient evidence before the jury by which it could find beyond a reasonable doubt that the defendant had used the deceased's credit cards to purchase the camcorder. We conclude that there was sufficient evidence.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force

of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citations omitted; internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 377–78, 796 A.2d 1191 (2002). "Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable." (Internal quotation marks omitted.) *State* v. *Ford*, 230 Conn. 686, 692, 646 A.2d 147 (1994).

On the basis of our review of the record, we conclude that there was sufficient evidence before the jury by which it could conclude that the defendant had used the decedent's credit card to purchase the camcorder

at Ritz Camera. The defendant argues that the state failed to prove its case because the clerk who sold the defendant the camcorder did not testify. It was not necessary for the clerk to testify. We note first that the defendant admitted in his written statement that he bought the camcorder. The defendant argues that although he admitted that he had bought the camcorder, that does not prove that he used the decedent's credit card to obtain it. The defendant's semantic argument is not persuasive.

The state introduced into evidence a copy of the sales transaction receipt kept in the ordinary course of business by Ritz Camera. The receipt indicated the date and time of the purchase, the price and item purchased, and the identity of the credit card, its number and the name of the person to whom it was issued. The receipt indicated that the decedent's credit card was used to purchase the camcorder at about 3 p.m. on June 20, 2000. Furthermore, the defendant's appearance in the police booking photograph matches the description given to Terry by the store clerk at the time of Terry's investigation on the afternoon of June 20, 2000. Also, the state introduced into evidence the video surveillance tape from Service Merchandise on the afternoon of June 20, 2000, in which the defendant is shown purchasing a gold chain with a credit card. The sales receipt from Service Merchandise indicates that the decedent's credit card was used to purchase the gold chain. From this evidence, the jury reasonably could have inferred that the defendant had purchased the camcorder with the decedent's credit card. We therefore conclude that the court properly denied the defendant's motions for a judgment of acquittal.

The judgment is affirmed.

In this opinion the other judges concurred.